19 P.3d 1209 (2001)
Donald MacKenzie BULLOCK, Jr., Appellant,
v.
STATE of Alaska, DEPARTMENT OF COMMUNITY AND REGIONAL AFFAIRS, Mike Irwin, Commissioner; State of Alaska, Department of Revenue, Wilson L. Condon, Commissioner; City of Valdez; and North Slope Borough, Appellees.
No. S-9092.
Supreme Court of Alaska.
March 23, 2001.
*1210 Donald M. Bullock, Jr., on his own behalf, Douglas, Appellant.
Stephen C. Slotnick and Marjorie L. Vandor, Assistant Attorneys General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee State of Alaska.
William M. Walker, Walker, Walker, Wendlandt & Osowski, L.L.C., Anchorage, for Appellee City of Valdez.
Susan A. Burke and Avrum M. Gross, Gross & Burke, P.C., Juneau, for Appellee North Slope Borough.
Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

OPINION
FABE, Justice.

I. INTRODUCTION

In this appeal we address two tax statutes, AS 29.45.080 and AS 29.45.100, that apply to municipalities with significant oil and gas properties. With respect to AS 29.45.080, we must determine whether to defer to the Department of Revenue's and the Department of Community and Regional Affairs's interpretation to allow municipalities to reduce all taxable property on a pro-rata basis when the value of such property exceeds the cap imposed by AS 29.45.080(c). Because we conclude that the Department's interpretation is continuous, long-standing, and not arbitrary or capricious, we affirm the superior court's decision that AS 29.45.080(c) supports the pro-rata reduction method. Next, we address a municipality's authority to tax for the repayment of bonded indebtedness under AS 29.45.100. Because that provision states that no limitation should apply to a municipality's ability to tax for debt service, we affirm the superior court's decision that the limitations contained in AS 29.45.080 do not abridge that authority.

II. FACTS AND PROCEEDINGS

A. Relevant Facts and Background

The tax statutes at issue here relate to the state's and municipalities' authority to tax property used in the exploration, production, and pipeline transportation of oil and gas in Alaska. In its 1973 Special Session the legislature created the State Property Tax (AS 43.56)[1] and established limitations on a municipality's authority to tax oil and gas property.[2] Such property, defined in AS 43.56.210(7)(A), includes drilling rigs, wells, tank farms, tanker terminals, the Trans-Alaska Pipeline, and other related property (43.56 property).
In large part, this appeal asks us to interpret AS 29.45.080(c), which imposes a valuation cap on the total property value that municipalities may tax. Two interpretations are at issue. One, advocated by Donald Bullock, is that in cases where the municipality's total tax base exceeds the limit imposed by AS 29.45.080(c), the municipality should tax 100% of locally assessed property and only tax a portion of oil and gas property. Under the other interpretation, advocated by the North Slope Borough (NSB), the City of Valdez (Valdez), and the State of Alaska (State), when a municipality's total property value exceeds the level set by AS 29.45.080(c), the municipality should reduce both the value of oil and gas property and locally assessed property, in equal proportion. NSB, Valdez, and the State currently adhere to this interpretation.
This appeal also concerns AS 29.45.100,[3] which addresses a municipality's authority to tax for the repayment of bonds (debt service).

*1211 1. Alaska Statute 43.56: oil and gas exploration, production and pipeline transportation property taxes

Alaska Statute 43.56, found within the state's revenue and taxation title, addresses the taxation of oil and gas property.[4] This statute authorizes both the state and municipalities to tax oil and gas property for their operating budgets. Specifically, AS 43.56.010(a) authorizes the state to levy an annual twenty mill tax on "the full and true value of" oil and gas property (43.56 property); AS 43.56.010(b) requires municipalities to tax 43.56 property at the same rate that they apply to other taxable property; AS 43.56.010(c) provides that the Department of Revenue ("Department") shall "designate the portion of the tax base against which the local tax may be applied" in cases where the total value of assessed property in a municipality exceeds the limit imposed by AS 29.45.080(c); and AS 43.56.010(d) provides that oil and gas taxpayers who pay municipal taxes under AS 29.45.080 shall receive a state tax credit for the amount of municipal taxes they pay.

2. Alaska Statute 29.45.080: municipal taxation and the tax on oil and gas production and pipeline property

In enacting the statutes at issue here, the legislature has attempted to strike a balance between the municipalities and the state. The statutes therefore impose limits on municipalities' authority to tax oil and gas property so that the state may also benefit from taxing oil and gas property. Specifically, AS 29.45.080(b) imposes a cap on the total tax revenue the municipality can recover, and AS 29.45.080(c) caps the total value of property the municipality may tax.

a. Alaska Statute 29.45.080(b): mill rate based on maximum taxable revenue under the $1,500 per capita limitation

Alaska Statute 29.45 addresses municipal taxation, and subsection .080 specifically addresses oil and gas taxation as provided for in 43.56, discussed above. This section describes the two methods by which municipalities may levy and collect taxes on 43.56 property. Alaska Statute 29.45.080(b) describes the first method by which municipalities may tax oil and gas property. This method is based on the total tax revenue that the municipality may collect in a given year. It imposes a $1,500 a year per-person cap on revenue:
A municipality may levy and collect a tax on the full and true value of taxable property taxable under AS 43.56 as valued by the Department of Revenue at a rate not to exceed that which produces an amount of revenue from the total municipal property tax equivalent to $1,500 a year for each person residing in its boundaries.
Thus, this section requires municipalities to adjust mill rates such that the total tax revenue from 43.56 property and other taxable *1212 property does not exceed $1,500 per person. Moreover, AS 43.56.010(b), discussed above, requires the municipality to tax the 43.56 property at the same rate that it applies to other taxable property.

b. Alaska Statute 29.45.080(c): mill rate based on maximum property value under the 225% valuation limitation

The more ambiguous provision is AS 29.45.080(c) which imposes a limit on the total property value that a municipality may tax. This section, which is the primary subject of this appeal, limits the total taxable property value to 225% of the average per capita value of property in the state, times the number of residents in the municipality. When the total property value in the municipality exceeds this value, the municipality must reduce the total taxable property value in order to bring the municipality's total tax base within the limit imposed by the 225% valuation cap. The statute does not make clear how the municipality should make this reduction, however, and the present case asks us to settle this confusion.
Subsection .080(c) provides:
A municipality may levy and collect a tax on the full and true value of that portion of taxable property taxable under AS 43.56 as assessed by the Department of Revenue which value, when combined with the value of property otherwise taxable by the municipality, does not exceed the product of 225 percent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality.
Thus, the equation to find the maximum taxable property value is

2.25 × (average per capita property value) × (n residents).
For example, if the average state-wide property value per capita were $50,000 and a municipality contained 10,000 people, the maximum tax base in the municipality would equal (2.25)($50,000)(10,000) = $1,125,000,000. If the actual tax base were in fact $2 billion, then the municipality would have to reduce that value by $875 million to comply with the 225% valuation cap. The critical issue is how the municipality should make that reductionwhether it should reduce the oil and gas property value by the full $875 million, or whether it should reduce both oil and gas property and other locally assessed property proportionately to fall within the limit.
There are two proposed approaches for reducing the total assessed value to comply with the 225% formula cap. Bullock's view is that the statute requires the municipality to reduce the value of only oil and gas property such that, when that portion is added to the full and true value of all other taxable property, the total amount does not exceed the maximum value under the 225% valuation cap. Thus, continuing with the above example, if the assessed value of both the local property and the 43.56 property were each $1 billion, the total taxable property would consist of the full $1 billion of locally assessed property but only $125 million of the 43.56 property.[5] The oil and gas taxpayer would then receive a credit against its state taxes for the amount of taxes it paid on the $125 million in taxable property, and the state could tax the remaining $875 million of 43.56 property in full.
The State, NSB, and Valdez advocate a different approach. Their method, which NSB and Valdez have been applying since 1978, and which the State of Alaska has consistently supported, is to reduce the assessed value of all the property in the municipality proportionately in order to arrive at the maximum value under the 225% formula cap. A municipality using this approach taxes a greater portion of oil and gas property than it would tax using Bullock's method.
The following arithmetic example illustrates the method that NSB and Valdez use *1213 in calculating the "reduction factor"the proportion by which the pro-rata method reduces the values of both the 43.56 property and the locally assessed property:

 (2.25) (average property value) (n residents)
(43.56 property value) + (locally assessed property value)

Substituting numbers from the above example reveals:

 (2.25)($50,000)(10,000) = 0.5625.
 $1,000,000,000 + $1,000,000,000

Thus, under this interpretation of AS 29.45.080(c), the municipality should only include 0.5625 of the 43.56 property and the locally assessed property. The sum of the resulting values of the two types of property should be less than or equal to the maximum tax base, $1,125,000,000 in this example. Arithmetically:
 (.5625 × $1,000,000,000) + (.5625 × $1,000,000,000)
 = $1,125,000,000.
The value of the taxable property for both the 43.56 property and the locally assessed property is $562,500,000.[6] This figure represents roughly fifty-six percent of the full value of each of the two types of property. Contrast this result with that which Bullock's method generates: $375,000,000 for the 43.56 propertywhich represents 12.5% of the full valueand $1,000,000,000 for the locally assessed propertywhich represents 100% of the full value.
The pro-rata method also results in a lower state tax collection under AS 43.56.010(a), since oil and gas taxpayers are allowed a credit against state tax for the municipal taxes they pay under AS 29.45.080.[7] And oil and gas taxpayers pay more municipal taxes, and hence have a larger credit, under the pro-rata method than under the Bullock method.

B. Procedural History

Donald Bullock, a former employee of the State of Alaska, initially filed his complaint against the State of Alaska in May 1998 along with the Ketchikan Gateway Borough (KGB), for whom he now works as a legislative liaison. The complaint challenged the State's interpretation of AS 29.45.080(c), which, as explained above, proportionately reduces the assessed valuation of both 43.56 property and locally assessed property in order to comply with the 225% valuation cap. NSB and Valdez moved to intervene as defendants, and Superior Court Judge Michael A. Thompson granted their motions.
Bullock and KGB argued that the Department of Revenue's interpretation of the statutes is wrong and that, when a municipality's total tax base exceeds the maximum property value limitation produced by the 225% formula, only the 43.56 property values should be reduced to achieve compliance with the cap. In a second claim, Bullock and KGB argued that limitations apply to a municipality's authority to tax 43.56 property for purposes of debt repayment under AS 29.45.100.
KGB withdrew from the case prior to oral argument pursuant to a stipulation that all parties signed. The superior court granted summary judgment for the State, NSB, and Valdez. This appeal followed.

III. STANDARD OF REVIEW

When the issue before us implicates "agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions," we review the agency's interpretation under the reasonable basis standard.[8] We believe that in this case, determining the appropriate "portion" of the "tax base" that municipalities may tax is a matter that involves agency expertise. In addition, both AS 43.56.010 and AS 29.45.080 reveal the legislature's intention to leave such determinations up to the Department. Alaska Statute 43.56.010 provides: "[i]f the *1214 total value of assessed property of a municipality taxing under AS 29.45.080(c) exceeds [the 225% valuation cap] ... the department shall designate the portion of the tax base against which the local tax may be applied."[9] And AS 29.45.080 provides in relevant part: "[a] municipality may levy and collect a tax on the full and true value of taxable property taxable under AS 43.56 as valued by the Department of Revenue." This language evinces the legislature's intent to allow the Department to "utilize its expertise to decide" how to determine the municipal tax base under AS 29.45.080(c).[10] Thus, because the statute involves agency expertise, and because the legislature intended to place the decision in the hands of the Department,[11] we apply the reasonable basis standard.
In applying the reasonable basis standard, we "consider factors of agency expertise, policy, and efficiency in reviewing discretionary decisions."[12] And this standard of review, which is highly deferential to the Department, is similar to the "unreasonable, arbitrary and capricious" standard.[13] With this standard for guidance, we turn now to the question whether the Department's pro-rata interpretation is reasonable.

IV. DISCUSSION

This appeal involves two major issues: first, whether AS 29.45.080(c) requires municipalities to reduce only the portion of oil and gas property such that that amount, when added to the full value of other locally assessed property, falls within the 225% valuation cap; and second, whether municipalities must apply the 225% tax base limitation to taxes for repaying bonded indebtedness under AS 29.45.100.

A. When the Full and True Value of Property in a Municipality Exceeds the Limit Imposed by the AS 29.45.080(c) 225% Valuation Cap, the Municipality May Reduce the Value of All Taxable Property on a Pro Rata Basis.

1. Statutory construction

Although AS 29.45.080(c) limits the value of property that a municipality may tax, it provides no guidance for how to reduce the total property value when that amount exceeds the value imposed by the statute's 225% cap. In arguing that the statute requires a reduction in only 43.56 property, Bullock relies essentially on a plain language analysis. Although the plain terms of the statute may make Bullock's position plausible, we have rejected the plain meaning rule in favor of a rule wherein "[s]tatutory construction begins with an analysis of the language of the statute construed in light of its purpose."[14] We have explicitly
rejected that formulation of the plain meaning rule which mandates that we must disregard all legislative history if the statute's wording is clear and unambiguous on its face. To do so would overly restrict our inquiry, since reference to legislative history may provide an insight which is helpful to making a judgment concerning what a statute means, and since words are necessarily inexact and ambiguity is a relative concept.[15]
This court will generally construe "statutes in pari materia where two statutes *1215 were enacted at the same time, or deal with the same subject matter."[16] Moreover, "[i]t is an established principle of statutory construction that all sections of an act are to be construed together so that all have meaning and no section conflicts with another."[17] Because subsection .080(c) relates to, and is incorporated in, the oil and gas taxation act, AS 43.56,[18] we look to AS 43.56 for guidance in determining the method for apportioning the tax base under subsection .080(c).
In particular, AS 43.56.010(c) sheds light on this issue. That provision states:
If the total value of assessed property of a municipality taxing under AS 29.45.080(c) exceeds the [225% valuation cap], the department shall designate the portion of the tax base against which the local tax may be applied.

(Emphasis added.) In referring to the "total value of assessed property," this section does not distinguish between 43.56 property and other, locally assessed property. "[T]otal value of assessed property" clearly refers to the total taxable property within the municipality.
The section then refers to the "portion of the tax base" that the municipality may tax. The "tax base" must include all of the taxable property within the municipality, and not merely the 43.56 property. It is not logical for 43.56 property alone to comprise the entire "tax base," because the statutory scheme contemplates the taxation of local, non-43.56 property.[19] Based on this language, it is reasonable to read AS 43.56.010(c) to mean that when a municipality's total property value exceeds the 225% valuation cap, the entire tax base is subject to reduction, and not merely the 43.56 property. This construction of AS 43.56.010(c) suggests that AS 29.45.080(c)'s paired phrases"full and true value of that portion of taxable property taxable under AS 43.56 as assessed by the Department of Revenue" and "the value of property otherwise taxable by the municipality"refer to the values of the two components of "the portion of the tax base" (with "tax base" meaning total tax base) in AS 43.56.010(c). Alaska Statute 43.56.010(c) requires the Department to designate these two components as locally taxable when the total value of assessed municipal property exceeds the valuation tax cap. The first tax base component, then, referred to in the first statutory phrase of AS 29.45.080(c), is 43.56 property value; the second component, referred to in the second phrase, is locally assessed property value. And, as designated by the Department under AS 43.56.010(c), each of these tax base components will reflect the pro rata reduction necessary to achieve compliance with the 225% valuation tax cap. Bullock's proposal to reduce only the 43.56 property is inconsistent with such a reading. Although we do not believe that this is the only interpretation that the statutory language will support, at the very least the language of these two provisionsAS 29.45.080(c) and AS 43.56.010(c)creates ambiguity. And when the meaning of a statute is ambiguous or in doubt, the Department's interpretation "is entitled to great weight." In this case the Department's pro-rata interpretation of these statutes has been long-standing, consistent, and widely known; thus we afford it great weight.

2. The Department has long interpreted subsection .080(c) to allow for a pro-rata reduction in oil and gas property and other locally assessed property.

Since 1978 the Department of Revenue has interpreted subsection .080(c) to allow for the pro-rata reduction of both 43.56 property and locally assessed property.
In determining that there is a long-standing agency interpretation of subsection *1216 .080(c), we conclude first that the Department has interpreted subsection .080(c), and second that this interpretation is long-standing.
We first determine that the Department of Revenue has, in fact, interpreted subsection.080(c) to permit municipalities to reduce total property using a pro-rata method. In 1978 the Department of Revenue sent a letter to the mayor of NSB, specifically applying the pro-rata method of the 225% formula cap to NSB's factual situation. The Deputy Commissioner of the Department of Revenue, John R. Messenger, concluded the letter by stating that the Department planned "to formalize this ruling in a form of a regulation in the near future." Although the Department never did codify the pro-rata interpretation as a formal regulation, it clearly ruled that it would "require a pro-rata reduction."[20]
Further evidence of the Department's long-standing interpretation comes from a Report to the Senate Community and Regional Affairs Committee that was submitted in January 1990 by the Senate Select Advisory Committee on Municipal Taxation of Oil and Gas Properties (the Select Committee). In that report, the Select Committee requested a regulatory change to clarify the appropriate procedure when the actual tax base of a municipality exceeds the 225% cap. The report stated that "[t]he regulations should incorporate existing and past state practice and provide that the reduction of the actual tax base total shall be made through a pro-rata reduction of both oil and gas property and other property within the municipality." (Emphasis added.)
The next question is whether the Department's interpretation has been long-standing. We have never specified a standard for what constitutes "long-standing." But here, the Messenger letter was written twenty-three years ago, and we conclude that twenty-three years easily qualifies as long-standing.
In addition, the Attorney General wrote a letter embracing the pro-rata interpretation. When an executive interprets legislation, that interpretation "is entitled to be given weight by the court in construing the intent of the statute."[21] And the Attorney General's opinions, while not controlling, are entitled to some deference in matters of statutory construction.[22] In this case, Attorney General Norman C. Gorsuch sanctioned the Department's pro-rata interpretation of the 225% cap when he wrote to the mayor of NSB in 1985 that "we have reviewed the [pro-rata] methodology and find that it comports with the method approved by the Department of Revenue for the North Slope Borough in 1978. As such, we find that it is a reasonable and defensible interpretation of the statute ." The Gorsuch letter independently approves of the pro-rata method used by NSB and Valdez. Perhaps more importantly, however, it is more evidence that the Department has, in fact, long interpreted subsection .080(c) to permit municipalities to calculate the municipal tax base using the pro-rata method.
In his argument against the Department's pro-rata interpretation, Bullock points to a 1988 letter from State Assessor Mike Worley. This letter, which Worley submitted to the director of his division in the Department of Community and Regional Affairs (DCRA), concluded that subsection .080(c) required municipalities to levy against 100% of the locally assessed value. But Worley's letter simply recommended that his concerns be *1217 pointed out to the Select Committee, which the senate had recently convened to review proper methods for municipal taxation of oil and gas properties. The Select Committee eventually recommended clarifying the law through legislation or regulations to conform with the existing pro-rata practice of NSB and Valdez. Furthermore, in a memorandum explaining his position to the commissioner of DCRA, Worley expressly recognized that the current method of taxation had been approved by the Department of Revenue since 1978, and he specifically acknowledged that the DCRA had no authority to alter the Department of Revenue's interpretation of the correct method of taxation: "It is not within the statutory authority of my office to take any action with regard to decisions made by other state agencies."
Moreover, we observe that in addition to being a long-standing practice of the Department, the pro-rata reduction method does not appear to conflict with the legislature's intentions. Indeed, the legislature has demonstrated continued deference to the Department's interpretation.
First, in drafting the statutes themselves, the legislature gave the Department "a generous amount of leeway in implementing these statutory schemes."[23]
Also, in 1982 the legislature passed an amendment to the current subsection .080(c), then subsection .045(b), in an attempt to clarify the language. The proposed change provided:
A municipality may levy and collect a tax on the full and true value of that portion of property taxable under this chapter and under AS 43.56 as assessed by the Department of Revenue which value, when combined with the value of property otherwise taxable by the municipality, does not exceed the product of 225 percent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality.[24]
This amendment, although ultimately vetoed by the governor for unrelated reasons, specified that both other property and AS 43.56 property were to be apportioned. It therefore indicates that the legislature intended to defer to the Department's pro-rata interpretation.
Moreover, the legislature appeared to endorse the pro-rata interpretation in its letter of intent to the current subsection .080(c):
It is not the intent of the House Community and Regional Affairs Committee in adopting AS 29.53.045 as the renumbered section 29.45.080 in CSHB 72 (C & RA) to alter the substance or effect of that provision.[25]
Since the "effect" of the 225% cap had been to permit NSB and Valdez to calculate their tax base using the pro-rata method, this letter of intent further evidences the legislature's intent to defer to the Department's application of subsection .080(c), which was to reduce both types of property proportionately pursuant to the Department's interpretation.[26]
A final piece of evidence that suggests that the legislature intended to defer to the Department's interpretation is a letter written by Senator Mike Szymanski, Chairman of the Senate Community & Regional Affairs Committee. He stated that "the present interpretation of [the 225% cap] is both appropriate and reasonable. In addition, the present system for taxing oil and gas properties is an *1218 integral part of the existing mechanism for municipal funding in the state."
The Messenger letter, the Gorsuch letter, the Worley correspondence, and the Report to the Senate Community and Regional Affairs Committee all demonstrate that the pro-rata reduction method is a continuous and long-standing Department interpretation. In addition, the legislature has deferred to that interpretation at least since 1982, when it first formally addressed the issue. Thus, the Department has consistently interpreted subsection .080(c) since 1978, and that interpretation does not conflict with legislative intentions. We therefore conclude that the Department's pro-rata interpretation, which permits a reduction in both 43.56 property and other property, is entitled to deference.

3. The pro-rata method does not violate the requirement to assess non-oil-and-gas property at full and true value or exceed the exemptions authorized by statute.

Bullock argues that the pro-rata method fails to assess non 43.56 property at full and true value as required by AS 29.45.110(a), and exceeds the exemptions authorized by AS 43.56.010(b). But as the State points out, assessments and exemptions are different matters than inclusion in the tax base. For, in apportioning the property that is included in the tax base under subsection .080(c), all property is assessed at full and true value and reduced in equal proportion. This method of calculating the municipal tax base does not under-assess or exempt any property.

B. The 225% Limitation Does Not Apply to Taxes Imposed to Repay Bonded Indebtedness.

The second major question in this appeal is whether the tax base limitation contained in subsection .080(c) extends to the imposition of taxes for debt service under AS 29.45.100. That section provides:
The limitations provided for in AS 29.45.080-29.45.090 do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds. Taxes to pay or secure the payment of principal and interest on bonds may be levied without limitation as to rate or amount, regardless of whether they are in default or in danger of default.
Since 1973 NSB has imposed taxes for the repayment of debt service on 100% of all taxable property within the municipality both 43.56 property and "property otherwise taxable."
Alaska Statute 29.45.100 specifically states that the limitations provided for in AS 29.45.080-.090 do not apply to taxes levied to pay the principal and interest on bonds. And we stated in North Slope Borough v. Sohio Petroleum Corp.[27] that the legislative history "is consistent with and distinctly supportive of a literal interpretation of [this section]."[28] We concluded in Sohio that the legislature did not intend to imply any limitations on a municipality's authority to tax for debt financing, and that no limitations should therefore be read into the statute.[29] Our decision in Sohio supports the conclusion that subsection .080(c)'s tax base limitation does not apply to a municipality's authority to levy taxes for debt service.
Moreover, in its Report to the Senate Community & Regional Affairs Committee, the Senate Select Advisory Committee requested "a regulation clarifying that the limits set out in AS 43.56(b), AS 43.56(c) and AS 29.45.090, do not apply to taxation of oil and gas property for the purpose of repayment of bonded indebtedness." Also, Attorney General Norman Gorsuch emphasized that the limitations of AS 29.45.080 and .090 apply only to operating expenses. His opinion stated:

*1219 AS [29.45.080(a)] in turn requires that a municipality which imposes a tax on AS 43.56 property must do so under the limitations set forth in subsection (b) and (c) of that section. These limitations, however, apply to operating expenses only and are, in effect, suspended by [AS 29.45.100].

....
The limitations provided for in [AS 29.45.080] or [29.45.090] do not apply to taxes levied or pledged to pay or secure the payment of the principal and interest on bonds.
....
This section, along with AS 29.58.180(a), authorizes taxes to pay for municipal bonds independent of the limitations of [AS 29.45.080].

....
The municipal tax on AS 43.56 property is limited only by [AS 29 .45.080]. However, the limitations in subsections (b) and (c) of that section apply to operating revenues only. They do not apply to debt financing, which is covered by [AS 29.45.100].

(Emphasis added.)
Given our decision in Sohio and the expressed intent of the Senate Committee and the Attorney General, we conclude that AS 29.45 .100 allows municipalities to tax 100% of all taxable property for purposes of debt service.[30]

V. CONCLUSION

Because we determine that the Department's pro-rata interpretation is consistent and long-standing and is not arbitrary or capricious, we AFFIRM the superior court's decision to read AS 29.45.080(c) to allow the pro-rata reduction method. Furthermore, because AS 29.45.100 specifically states that no limits apply to a municipality's authority to tax for debt financing, and because we have interpreted that provision to mean what it says, we also AFFIRM the superior court's decision that the tax base limitation contained in subsection .080(c) does not apply to taxes for the repayment of bonded indebtedness.
MATTHEWS, Chief Justice, dissents.
MATTHEWS, Chief Justice, dissenting.
Out of deference to the state's longstanding interpretation of the Oil and Gas Property Tax Act, today's opinion affirms the state's method of pro-rata reduction of "other" property. But deference to an agency interpretation is appropriate only when the interpretation is reasonable.[1] In my judgment the pro-rata reduction interpretation is not reasonable. It conflicts with AS 29.45.080(c)'s exclusive formula for determining the portion of oil and gas property taxable by a municipality. It violates the requirement that municipalities tax oil and gas property at the same rate that they tax other property, and, alternatively, it violates the requirement that municipalities limit other property exemptions from taxation to those expressed in AS 29.45.030, .050 and AS 43.56.020. For these reasons, I dissent.

*1220 Background

The Oil and Gas Property Tax Act was passed by the legislature in special session in 1973. Oil and gas, and thus oil and gas property, were regarded as resources which should benefit all Alaskans. Because oil and gas production and transportation property was concentrated in a limited area of the state, the legislature believed that the state should tax this property for the benefit of all Alaskans, while still allowing the municipalities whose boundaries encompassed oil and gas property to directly benefit from it to some degree. Governor Egan set the context of the special session in his opening remarks: "The extremely difficult problem we face is this: When vast amounts of taxable oil and gas property are situated unequally throughout the State, what manner of distributing tax revenues derived is fairest, both to the local governments involved and to the rest of the State?"[2]
The disproportionate tax base in the North Slope Borough and in Valdez was of paramount concern. The Senate Committee on Community and Regional Affairs report of November 3, 1973, stated:
Even though the North Slope Borough will have both temporary and permanent impact, still the tax base available to them... would be so disproportionate to the rest of the State as to produce a shocking inequity. For example, upon completion of the pipeline, the North Slope Borough would have as a minimum approximately ¾ billion dollar tax base.... With a population of 4,000 persons, the borough would have a tax base of $187,500 per capita. The State average tax base is $12,000 per capita. Anchorage, for example, is $17,500 per capita. Both the House and the Senate bills adopted the same mechanism and limited the per capita revenues. In the House it was limited to $1,000 per person and in the Senate $2,000 per person.... The figures suggested by either the House or the Senate provided per capita revenues... greatly in excess of those received by any other community in the state. Anchorage, for example, has total tax revenues of approximately $350 per person. The higher $1,000 (or possibly $2,000) figure can be justified for the North Slope Borough because of the higher living costs in the North Slope Borough, the excessive construction costs for such things as sewers, schools, etc., and also because the North Slope Borough covers the gigantic Arctic North Slope Plain, extending from Canada on the east to the Chukchi Sea on the west. Although the $1,000 or perhaps even the $2,000 may be rational as a per capita limit on the North Slope, neither of these figures is rational as a per capita limitation in Valdez.[3]
As enacted in 1973, the Oil and Gas Property Tax Act had six sections, only four of which are important to the present issue. In discussing the act, I will describe it as it now exists, for no changes important to this case have been made since the original enactment.[4]
In section 1 of the act, AS 43.56.010(a) provides that the state may tax oil and gas *1221 property at an annual rate of 20 mills. Subsection (b) of .010 provides that municipalities may also tax oil and gas property under AS 29.45.080. Subsection (d) provides that taxes on oil and gas property paid to a municipality under AS 29.45.080 are to be credited against state taxes levied under subsection.010(a).
In order to constrain municipal taxation of oil and gas property and thus prevent an undue drain on state tax revenues, important limitations are built into the act. The first is the equal rate requirement. Alaska Statute 43.56.010(b) provides that a municipality's tax on oil and gas property "shall be levied at a rate no higher than the rate applicable to other property taxable by the municipality." The reason for this limitation is obvious. If municipalities could tax oil and gas property at a rate higher than other property they would have little or no reason not to do so. The owners of oil and gas property are not well represented among municipal voters, and the statewhich ultimately pays the municipal tax under the crediting mechanism of subsection .010(d)is not part of the municipal body politic. Thus municipalities would tend to tax oil and gas property at maximum rates, while taxing other property either minimally or not at all. By imposing an equal rate requirement, the legislature hoped that the downward pressure imposed by the reluctance of owners of other property to pay higher levels of taxes would constrain municipalities from diverting to themselves state tax revenues from oil and gas property. We have confirmed this view of the purpose of the equal rate requirement:
This limitation was apparently intended to prevent a borough from shifting its fiscal responsibilities away from its general property owners and onto the shoulders of the oil and gas industry, and ultimately, due to the credit against state taxes, onto the state government. In other words, local residents should pay their fair share *1222 of the cost of local government rather than casting the burden disproportionately onto the people of the state.[5]
Hand in glove with the equal rate limitation is a prohibition on the exemption of other property from taxation. Exemptions must be limited because otherwise a municipality might exempt a high percentage of other propertysay 90% of valuewhile taxing the remainderin my example 10%at the same rate that it taxed the portion of oil and gas property it was permitted to tax. In this way a municipality would be able to argue that it was complying with the equal rate limitation, while in fact the effective rate for other property would be only 10% of the rate at which the municipality taxed oil and gas property.[6] To close this loophole, AS 43.56.010(b) limits exemptions to those already authorized by statute, with one exception, which is contained in section 2 of the act. This amends AS 29.45.050(a), permitting a $10,000 exemption for each residence.
Section 3 of the act enacted a new section, AS 29.45.080, which contains two alternative methods under which municipalities may impose taxes on oil and gas property. These methods are exclusive in the sense that they are the only methods by which municipalities may tax oil and gas property.[7] The first alternative uses a revenue cap; the second, a property cap. The revenue cap method in subsection .080(b) allows a municipality to tax the full and true value of all oil and gas property within the municipality, but limits the tax rate to that which, when applied to all oil and gas property in the municipality and all other property, produces revenues of no more than $1500 per person.[8]
Our concern in this case is with the property cap method. Alaska Statute 29.45.080(c) caps a municipality's property tax base at 2.25 times the state per capita average. When the cap is exceeded by the sum of the value of oil and gas property and other property, subsection .080(c) permits a municipality to tax only a portion of the value of oil and gas property. How this portion of value is to be calculated is the nub of this case. The portion of value of oil and gas property taxable by a municipality is somewhat dauntingly described in .080(c) as "which value, when combined with the value of property otherwise taxable by the municipality, does not exceed the product of 225 percent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality."[9]
The property cap method was advocated in preference to the revenue cap method by the Department of Community and Regional Affairs. Commissioner Mallott explained its advantages:
The average per capita assessed valuation index is suggested as a compromise between those who would have the State assume exclusive authority for levy of an ad valorem tax on property used in conjunction with oil activity and those who have claimed that removal from municipalities of authority to levy on that property in support of services required would sharply restrict local capacity to act. The index chosen as the restricting factordouble the State average assessed valuation of property per capitais offered that the *1223 existing range of averages of particular municipalities is not unduly affected, but that future variations are held within tolerable limits, in light of essential local revenue needs as determined by elected officials in the municipalities concerned.[10]
Commissioner Mallott proposed the property cap method because he questioned whether the revenue cap "is, and will remain, an upper limit sufficient to allow recovery of revenues for essential public services in municipalities affected."
To cite the North Slope Borough as an example, a limit of $1,000 per capita revenue return in ensuing fiscal years may not reasonably allow that unit of government to recover revenues sufficient to defray costs of constructing public facilities, operating schools, assuming responsibilities for public works and utilities, and addressing other public needs which its citizens may demand.[11]
Commissioner Mallott also noted that the $1000 revenue cap method would result in unusually low maximum mill rates in the oil and gas property advantaged communities of the North Slope Borough and Valdez. In each case the maximum mill rate would be under 3 mills after 1977.
Because the House of Representatives favored the revenue cap method and some senators favored the property cap method, both methods were included in the act. The free conference committee reached this resolution after a Department of Revenue official predicted that the difference between the two methods would not be great, about $1 million in the early years, increasing to about $3 or $4 million later.[12]
Once the act was passed, the State Department of Revenue initially construed the property cap method to require a reduction in the taxable portion of only oil and gas property and not other propertywhen the total value of oil and gas property and other property in a municipality exceeded the 225% cap. This point is made clear in a February 1977 report prepared by the State Department of Revenue and transmitted by Commissioner of Revenue Gallagher to Governor Hammond:
If the assessed value of taxable oil and gas properties would result in a total assessed valuation exceeding this product (225% of average per capita statewide assessed value multiplied by the number of the municipality's residents) when added to the assessed valuation of other property in the municipality, then the Department of Revenue designates what portion of the oil and gas assessment the municipality may tax. AS 43.56.010(c).[13]
But in 1978 this interpretation changed. Deputy Commissioner of Revenue Messenger, in a letter to the mayor of the North Slope Borough, described how the department "has modified its earlier position regarding the [225% cap]." Instead of designating "what portion of the oil and gas assessment the municipality may tax," as in the Gallagher report, the department under Messenger's method "will require a pro-rata reduction in the assessed value of all property in the municipality so that it comes within the limitation."
Although the Messenger letter proceeded to illustrate the pro-rata methodology, it did not analyze the language of the act. Nonetheless, the interpretation set out in the Messenger letter has been consistently applied since 1978. In late 1988 the state assessor issued a lengthy report critical of, among other things, the pro-rata reduction method. *1224 This report triggered the appointment of a select advisory committee to the Senate Committee on Community and Regional Affairs. The select committee issued a report that defended the pro-rata method and recommended regulatory changes and constraints on the authority of the state assessor. No action was taken on the report.

Calculating the Portion of Oil and Gas Property Taxable By a MunicipalityA Plain Reading of the Act
Alaska Statute 43.56.010(c) provides that where the "total value of assessed property of a municipality taxing under AS 29.45.080(c)" exceeds the 225% cap, the Department of Revenue "shall designate the portion of the tax base against which the local tax may be applied." Subsection .010(c) does not itself include a formula that would control how the Department of Revenue chooses to designate the taxable portion of the local tax base. But subsection .010(c) applies only to municipalities taxing under AS 29.45.080(c), and subsection .080(c) does contain such a formula.
Shortened for ease of understanding, AS 29.45.080(c) provides: "A municipality may levy ... a tax on the ... value of that portion of [oil and gas property] which value, when combined with the value of property otherwise taxable by the municipality does not exceed [the 225% cap]." This describes in plain language the formula for determining what portion of oil and gas property is taxable by a municipality. From the 225% cap subtract "the value of property otherwise taxable." The remainder is the portion of oil and gas property taxable by a municipality. Expressed mathematically the equation is [portion of value of oil and gas property taxable by municipality] = [225% cap]-[value of property otherwise taxable].
Once the portion of oil and gas property taxable by a municipality is determined, it becomes a simple matter for the Department of Revenue to designate the portion of the tax base against which the local tax may be applied under AS 43.56.010(c). The Department arrives at that figure by adding the "value of property otherwise taxable by the municipality" to the value of the portion of oil and gas property taxable by the municipality, the latter of which has already been determined under AS 29.45.080(c). The sum of these two figures is the portion of the total tax base that the municipality may tax. Mathematically this equation is [tax base] = [portion of value of oil and gas property taxable by municipality] + [value of property otherwise taxable].
The fact that AS 29.45.080(c) clearly supplies a formula for determining the portion of oil and gas property taxable by a municipality does not necessarily mean that the plain language of that subsection is controlling. We have rejected the aspect of the "plain meaning" rule that bars a court from considering legislative history as an interpretative aid if a statute's meaning is facially "plain."[14] Nonetheless, the literal meaning of a statute will control unless it is convincingly contradicted by evidence of legislative intent. "Although we normally give unambiguous language its plain meaning, we may rely on legislative history as a guide to interpreting a statute. But `the plainer the language of a statute, the more convincing contrary legislative history must be' to interpret a statute in a contrary manner."[15]
In this case, the literal or plain meaning of the formula expressed in .080(c) is in harmony with the legislative history of the Oil and Gas Property Tax Act. The act was intended to permit the state to raise revenue from a property tax on oil and gas property, while also permitting municipalities whose boundaries encompassed oil and gas property to tax it for local revenue needs. The formula expressed in subsection .080(c) accomplishes *1225 this purpose.[16] Therefore, the literal meaning of this subsection is controlling.

Calculating the Portion of Oil and Gas Property Taxable By a MunicipalityHow Pro-Rata Reduction Conflicts with the Language of AS 29.45.080
In this part of this dissent I will explain why the pro-rata reduction method cannot reasonably be squared with the language of AS 29.45.080. For ease of understanding I set out here the pertinent language of that section, underlining for emphasis the words and phrases discussed in the following paragraphs. Alaska Statute 29.45.080 provides in relevant part:
(a) A municipality may levy and collect taxes on taxable property taxable under AS 43.56 only by using one of the methods set out in (b) or (c) of this section.
(b) [sets out the $1,500 annual per capita revenue method]
(c) A municipality may levy and collect a tax on the full and true value of that portion of taxable property taxable under AS 43.56 as assessed by the Department of Revenue which value, when combined with value of property otherwise taxable by the municipality, does not exceed the [225% property cap].
I believe that "the value of property otherwise taxable" in subsection .080(c) plainly refers to all taxable property other than oil and gas property taxable under 43.56. Under a plain language interpretation of .080(c), that subsection calls for the taxation of (1) the entire value of taxable property other than oil and gas property taxable under 43.46, and (2) whatever portion of oil and gas property would, when added to the value of property otherwise taxable, not exceed the 225% cap. But because the pro-rata method taxes a larger amount of oil and gas property than is taxable under the plain language interpretation, the amount of "property otherwise taxable" that can be taxed must be reduced in order to keep the total taxable value of property within the 225% cap. To sustain the Department of Revenue's pro-rata reduction method, therefore, "the value of property otherwise taxable" must be read as referring only to a portion of taxable property other than oil and gas property taxable under 43.56.
Although this interpretation is required by the pro-rata reduction method, it is contradicted by the language of .080(c). In subsection.080(c), the word "portion" is only used to modify "property taxable under 43.56." It is not used to modify "property otherwise taxable." This pointed omission clearly implies that alland not merely a portionof "property otherwise taxable" is to be used in determining the portion of 43.56 property taxable by a municipality. Because the Department's pro-rata reduction method taxes only a portion of property otherwise taxable, it runs counter to the language of .080(c).
When the lead-in language of subsection.080(a) is examined, two additional inconsistencies between pro-rata reduction and the language of .080(c) become apparent. Subsection.080(a) is explicit in stating that municipalities may tax 43.56 property "only by using one of the methods set out in (b) or (c)...." This language is important for two reasons. First, it indicates that subsection (c) sets out a method under which municipalities may tax oil and gas property. Second, it states that the method set out in subsection (c) is the only method under which municipalities may tax oil and gas property.[17]
Turning to the first of these reasons, if "the value of property otherwise taxable" in subsection .080(c) is read to refer to the *1226 entire value of "property otherwise taxable," then municipalities and the Department can plug that amount into the formula provided by .080(c) and determine exactly how much 43.56 property is taxable. Subsection .080(c) would thus fulfill its mandated purpose of setting out a method under which a municipality may tax oil and gas property. But if "the value of property otherwise taxable" is read to refer only to a portion of the value of "property otherwise taxable," the formula provided by the statute would not yield any particular result. Instead, the amount of 43.56 property that could be taxed would depend on what portion of "property otherwise taxable" could be taxed. But subsection.080(c) does not provide any method for determining what portion of "property otherwise taxable" can be taxed. As a result, continuing with the assumption that "value of property otherwise taxable" refers only to a portion of such value, subsection .080(c) would not provide a method for the taxation of 43.56 property. It would therefore fail to fulfill its explicit purpose. The interpretation of .080(c) required by the pro-rata reduction method thus cannot be correct, as that interpretation would leave this subsection unusable in determining how municipalities may tax 43.56 property.
Turning to the point that the .080(c) method is exclusive, it is clear that pro-rata reduction is not the method prescribed by subsection.080(c) for determining what portion of oil and gas property may be taxed. Because the method specified by subsection .080(c) is explicitly the "only" method under which municipalities availing themselves of the property cap alternative may tax oil and gas property, pro-rata reduction is not a permissible option.

Pro-Rata Reduction Violates the Equal Rate Requirement
The only formula set out in the Oil and Gas Property Tax Act under which one may determine the portion of oil and gas property that a municipality may tax is that expressed in AS 29.45.080(c). Since the formula in subsection .080(c) conflicts with the pro-rata reduction method, the latter method, in my judgment, necessarily violates the statute. But there is another reason why pro-rata reduction is wrong: pro-rata reduction violates the requirement that the portion of oil and gas property taxable by a municipality be taxable at the same rate as other property.
This can be illustrated by using the assumptions and the explanation of the pro-rata reduction method expressed in the 1978 Messenger letter. I quote here the Messenger letter assumptions and calculations:

 Assumptions
Average per capita assessed full and true
value of property in Alaska (assumed).....$ 30,000
North Slope Borough residents (assumed) 10,000
Assessed Value of AS 43.56 property within
North Slope Borough (assumed)............. 2,500,000,000
Assessed Value of non-AS 43.56 property
within North Slope Borough (assumed) ... 500,000,000
Total assessed value of all property within
North Slope Borough........................ 3,000,000,000
 Calculation
 1. ($30,000) × (225 percent) × (10,000) =
 $675,000,000
 ($675,000,000 is the total assessed value of
 property in the North Slope Borough that can
 be taxed.)
 2. 3,000,000,000 > 675,000,000
 (Apportionment of the tax base is necessary.)
 3. 3,000,000,000 = .225
 675,000,000
 (The entire tax base must be reduced to 22.5
 percent of its full value to come within the
 675,000,000 limit.)
 4. 2,500,000,000 × .225= 562,500,000
 (Value of AS 43.56 property that
 can be taxed)
 500,000,000 × .225 = 112,500,000
 (Value of other property that can
 be taxed)
 ____________
 675,000,000

Expressed textually, the Messenger calculations tell us that under the assumptions *1227 used the 225% cap is $675,000,000. Pro-rata reduction of oil and gas property and other property requires that each element of the tax base be reduced to 22.5% of full value. This results in a figure of $562,500,000 as the portion of oil and gas property taxable by the municipality. Messenger describes this as the "value of AS 43.56 property that can be taxed."
Now assume that the municipality levies a tax of 20 mills. This is levied on the tax base as limited, $675,000,000. The municipality receives $13,500,000. Of this sum, the municipality receives $11,250,000 (.02 × 562,500,000) from the owners of oil and gas property. The owners are indifferent to this tax, for it will be paid by a credit on their tax bill to the state. It is thus accurate to say that the $11,250,000 comes from diverted state revenues. The municipality receives $2,250,000 (.02 × 112,5000) from the owners of other property.
What is the actual rate paid by the owners of other property in this scenario? The municipality imposes the 20-mill tax on only 22.5% of the value of other property using the Messenger calculations. This means that the tax rate on other property is actually not 20 mills, but is instead only 4.5-mills (.225 × 20 = 4.5). So an owner of taxable other property worth $100,000 in this municipality would pay property taxes of $450 ($100,000 × .225 × .02), which is the tax that would be produced by a 4.5 mill rate. By contrast, if the tax were actually 20 mills, the owner would pay a tax of $2,000.
But the $562,500,000 of oil and gas propertyin Messenger's words, "the value of AS 43.56 property that can be taxed"would in fact be taxed by the municipality at the rate of 20 mills. Therefore the municipality would not be taxing the portion of oil and gas property that it is permitted to tax at the same rate of taxation that it applies to other property. This demonstrates that the pro-rata reduction method results in a violation of the equal rate requirement.
It is worthwhile, by contrast, to show what the result would be under AS 29.45.080(c)'s formula for determining the portion of oil and gas property taxable by a municipality. Again using the Messenger assumptions, the 225% tax cap would still be $675,000,000 and this would still be the tax base. Imposing taxes under the literal statutory formula at 20 mills, the municipality would still receive the same amount of revenue as it received under the pro-rata method, $13,500,000. But the makeup of the tax base would be different. From the 225% property cap of $675,000,000, the value of other property, $500,000,000, would be subtracted, leaving $175,000,000 of oil and gas property that could be taxed by the municipality. The tax base would thus consist of

 - value of oil and gas
 property that can be
 taxed = $175,000,000
 - value of other property
 that can be taxed = $500,000,000
 - 225% property cap $675,000,000

Applying a 20-mill tax to these elements, $10,000,000 of total revenues would come from the owners of other property (who in this case are paying taxes at a 20 mill rate of assessment) and $3,500,000 would come from oil and gas property tax revenue diverted from the state treasury.
In summary, using the Messenger assumptions the state pays almost $8,000,000 more to the municipality under the pro-rata method than it would using the formula expressed in AS 29.45.080(c). Use of the pro-rata formula, in other words, causes exactly what the equal rate limitation was designed to prevent, a "shifting" of a municipality's "fiscal responsibilities away from its general property owners and onto the shoulders of the oil and gas industry, and ultimately, due to the credit against state taxes, onto the state government."[18] In this respect the pro-rata reduction method conflicts with the state revenue-raising purposes of the act. The objective *1228 of the equal rate requirement, that "local residents should pay their fair share of the cost of local government rather than casting the burden disproportionately onto the people of the state," is thereby lost.[19] And the constraint on high taxation of oil and gas property that would exist if the tax rates were equal is also lost, for the owners of other property pay taxes at a rate that is less than a fourth of the rate on oil and gas property.[20]

Alternatively, the Pro-Rata Reduction Method Exempts Other Property from Taxation in Violation of the Exemption Limitations Contained in the Act
In enacting the Oil and Gas Property Tax Act, the legislature took pains to restrict the exemptions that municipalities could offer to the owners of other property.[21] This was done to prevent an end run around the equal rate requirement. But as is demonstrated by the Messenger letter calculations, the effect of pro-rata reduction is to exempt from taxation a certain percentage of the value of other property. In the Messenger calculation the exemption amounts to 77.5% of the value of other property. This exemption permits a facially equal tax rate to have a distinctly unequal effect. In the words of Commissioner Mallott, this permits the "fiscal equity" inherent in the equal rate requirement to be "frustrated."[22]
In passing the act the legislature intended that no portion of otherwise taxable property in advantaged municipalities should go untaxed, for this would occur at the expense of the rest of the state. The legislature built the prohibition on exemptions into the act in order to prevent exactly this result. The act was a response to what one legislative committee described as "a shocking inequity" between oil and gas property advantaged municipalities and other municipalities.[23] Its purpose was to reduce this inequity by sharing tax revenues from oil and gas property statewide. No part of this purpose entailed state-funded tax relief to the owners of locally assessed property in tax advantaged municipalities. But by insulating a portion of locally assessed property from taxation, that is the effect of the pro-rata reduction method.

Conclusion
I would reverse the judgment of the superior court with respect to the pro-rata reduction issue. Although the pro-rata reduction method is longstanding, it has never been reasonable. It is contradicted by the plain language of AS 29.45.080(c), which, in turn, accords with the purposes of the act, while the pro-rata reduction method does not. The pro-rata reduction method also demonstrably violates the equal rate requirement of AS 43.56.010(b) and, alternatively and equally demonstrably, violates the limitation on exemptions to other property imposed by the same subsection. The result is a prohibited shifting of the tax burden in tax advantaged municipalities from the owners of other property to the state as a whole.
NOTES
[1] Ch. 1, § 1 FSSLA 1973.
[2] Those municipal limitations, contained in AS 29.45.080 and AS 29.45.090, were originally enacted AS 29.53.045 and AS 29.53.050, respectively, Ch. 1, §§ 1, 3, 4 FSSLA 1973.
[3] This statute was originally enacted as AS 29.53.055. See Ch. 1, § 5 FSSLA 1973. This opinion shall refer to the provisions contained in AS 29.45 repeatedly. The following table shows the current statute numbers, effective January 1, 1986, see Ch. 74, § 12 SLA 1985, and their corresponding former numbers as originally enacted in 1973:

 CURRENT LAW PRIOR LAW
 AS 29.45.080 AS 29.53.045
 AS 29.45.090 AS 29.53.050
 AS 29.45.100 AS 29.53.055

[4] AS 43.56.010 provides in relevant part:

(a) An annual tax of 20 mills is levied each tax year beginning January 1, 1974, on the full and true value of taxable property taxable under this chapter.
(b) A municipality may levy and collect a tax under AS 29.45.080 at the rate of taxation that applies to other property taxed by the municipality. The tax shall be levied at a rate no higher than the rate applicable to other property taxable by the municipality....
(c) If the total value of assessed property of a municipality taxing under AS 29.45.080(c) exceeds the product of 225 percent of the average per capita assessed full and true value of property in the state, to be determined by the department and reported to each municipality by January 15 of each year, multiplied by the number of residents of the taxing municipality, the department shall designate the portion of the tax base against which the local tax may be applied.
(d) A tax paid to a municipality under AS 29.45.080 or former AS 29.53.045 on or before June 30 of the tax year shall be credited against the tax levied under (a) of this section for that tax year....
[5] $1,125,000,000-$1,000,000,000 = $125,000,000. This figure represents only 12.5% of the total value of the 43.56 property.
[6] (0.5625) × ($1,000,000,000) = $562,500,000.
[7] See AS 43.56.010(d) ("A tax paid to a municipality under AS 29.45.080 or former AS 29.53.045 ... shall be credited against the tax levied [by the state] for that tax year."); Kenai Peninsula Borough v. State, Dep't of Community & Reg'l Affairs, 751 P.2d 14, 15 (Alaska 1988) ("The [oil and gas] taxpayer is entitled to a credit against its state tax for tax paid to a borough.").
[8] Matanuska-Susitna Borough v. Hammond, 726 P.2d 166, 175 (Alaska 1986).
[9] AS 43.56.010(c) (emphasis added).
[10] Matanuska-Susitna, 726 P.2d at 175-76; see also Storrs v. State Med. Bd., 664 P.2d 547, 552 (Alaska 1983), cert. denied, 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983) ("[S]tatutory construction adopted by those responsible for administering a statute should not be overruled in the absence of `weighty reasons.'").
[11] See Matanuska-Susitna, 726 P.2d at 175.
[12] Id. at 176.
[13] See id.
[14] Borg-Warner Corp. v. Avco Corp., 850 P.2d 628, 633 n. 12 (Alaska 1993).
[15] State, Dep't of Natural Resources v. City of Haines, 627 P.2d 1047, 1049 n. 6 (Alaska 1981) (internal citations omitted); see also Dillingham v. CH2M Hill Northwest, 873 P.2d 1271, 1276 (Alaska 1994) ("Though we give unambiguous statutory language its ordinary and common meaning, we have rejected the `plain meaning' rule as an exclusionary rule, and we may look to legislative history as a guide to construing a statute's words.").
[16] Underwater Constr., Inc. v. Shirley, 884 P.2d 150, 155 (Alaska 1994).
[17] In re Hutchinson's Estate, 577 P.2d 1074, 1075 (Alaska 1978).
[18] See AS 29.45.080(a)-(c); AS 43.56.010(b)-(d).
[19] See AS 29.45.080(c).
[20] See Wien Air Alaska, Inc. v. Department of Revenue, 647 P.2d 1087, 1093-94 (Alaska 1982) (stating that the Department of Revenue may issue a ruling by means of a letter, "a written statement issued to a taxpayer or his authorized representative ... which interprets and applies the tax laws to a specific set of facts," and that "[r]evenue rulings arise from various sources, including rulings to taxpayers, [and] technical advice to district offices").
[21] Flisock v. State, Div. of Retirement & Benefits, 818 P.2d 640, 645 (Alaska 1991).
[22] See National Bank of Alaska v. Univentures, 824 P.2d 1377, 1381 (Alaska 1992); Carney v. State, Bd. of Fisheries, 785 P.2d 544, 548 (Alaska 1990).
[23] Matanuska-Susitna Borough v. Hammond, 726 P.2d 166, 181 (Alaska 1986) (addressing Department's methods for determining "population" under the current AS 29.45.080).
[24] House Committee Substitute Committee for Senate Bill (H.C.S.C.S.S.B.) 180, 12th Leg., 2nd Sess. (1982) (emphasis added to highlight change).
[25] 1985 House Journal at 600.
[26] Moreover, we cited the above letter of intent in Matanuska-Susitna to support our conclusion that the legislature intended to adopt pre-existing administrative interpretations when it re-adopted AS 29.45.080 without change. See 726 P.2d at 176 n. 19.
[27] 585 P.2d 534 (Alaska 1978).
[28] Id. at 543 (interpreting AS 29.53.055 before it was renumbered to AS 29.45.100).
[29] See id. at 541.
[30] The legislative intent expressed in similar statutes supports this interpretation as well. See AS 44.85.005 ("The legislature finds that (1) the rapid growth of municipalities in the state and the incorporation of new municipalities has created a demand for capital improvements that can only be met by these municipalities borrowing money through the issuance of bonds or notes."); AS 44.85.010(a) ("It is the policy of the state (1) to foster and promote by all reasonable means the provision of adequate capital markets and facilities for borrowing money by municipalities in the state to finance capital improvements or for other authorized purposes, to assist these municipalities in fulfilling their capital needs and requirements by use of borrowed money within statutory interest rate or cost of borrowing limitations, to the greatest extent possible to reduce costs of borrowed money to taxpayers and residents of the state, and equally to encourage continued investor interest in the purchase of bonds or notes of municipalities as sound and preferred securities for investment; (2) to encourage municipalities to continue their independent undertakings and financing of capital improvements and other authorized purposes.").
[1] See Totemoff v. State, 905 P.2d 954, 968 (Alaska 1995); Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that deference may be given to agency interpretation only if it is based on permissible construction of statute).
[2] Senate Journal Supp. No. 1 at 3-4, 1973 Senate Journal Special Session.
[3] 1973 Senate Journal Special Session 77-78.
[4] The act, updated to reflect renumbering and minor amendments, provides:

Section 1. AS 43 is amended by adding a new chapter to read:
CHAPTER 56. OIL AND GAS EXPLORATION, PRODUCTION AND PIPELINE TRANSPORTATION PROPERTY TAXES.
Sec. 43.56.010. LEVY OF TAX. (a) An annual tax of 20 mills is levied each tax year beginning January 1, 1974, on the full and true value of taxable property taxable under this chapter.
(b) A municipality may levy and collect a tax under AS 29.45.080 at the rate of taxation that applies to other property taxed by the municipality. The tax shall be levied at a rate no higher than the rate applicable to other property taxable by the municipality. A municipality may not exempt from taxation property authorized to be taxed under this chapter. Exemptions shall be limited to those in AS 29.45.030, 29.45.050, and AS 43.56.020.
(c) If the total value of assessed property of a municipality taxing under AS 29.45.080(c) exceeds the product of 225 percent of the average per capita assessed full and true value of property in the state, to be determined by the department and reported to each municipality by January 15 of each year, multiplied by the number of residents of the taxing municipality, the department shall designate the portion of the tax base against which the local tax may be applied.
(d) A tax paid to a municipality under AS 29.45.080 or former AS 29.53.045 on or before June 30 of the tax year shall be credited against the tax levied under (a) of this section for that tax year. If, however, a tax is not paid to a municipality until after June 30 of the taxable year, the department upon application shall refund to the taxpayer the amount of tax paid to the municipality under AS 29.45.080 or former AS 29.53.045. The credit or refund of taxes paid to a municipality may not exceed the total amount of tax levied by the department upon the taxpayer for the tax year, under (a) of this section.
....
Section 2. AS 29.45.050 is amended to read:
(a) A municipality may exclude or exempt or partially exempt residential property from taxation by ordinance ratified by the voters at an election. An exclusion or exemption authorized by this section may not exceed the assessed value of $10,000 for any one residence.
....
Sec. 3. AS 29.45 is amended by adding a new section to read:
Sec. 29.45.080. TAX ON OIL AND GAS PRODUCTION AND PIPELINE PROPERTY. (a) A municipality may levy and collect taxes on taxable property taxable under AS 43.56 only by using one of the methods set out in (b) or (c) of this section.
(b) A municipality may levy and collect a tax on the full and true value of taxable property taxable under AS 43.56 as valued by the Department of Revenue at a rate not to exceed that which produces an amount of revenue from the total municipal property tax equivalent to $1,500 a year for each person residing in its boundaries.
(c) A municipality may levy and collect a tax on the full and true value of that portion of taxable property taxable under AS 43.56 as assessed by the Department of Revenue which value, when combined with the value of property otherwise taxable by the municipality, does not exceed the product of 225 percent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality.
....
Sec. 4. AS 29.45.090 is amended by adding a new subsection to read:
(b) A municipality, or combination of municipalities occupying the same geographical area, in whole or in part, may not levy taxes
(1) that will result in tax revenues from all sources exceeding $1,500 a year for each person residing within the municipal boundaries; or
(2) upon value that, when combined with the value of property otherwise taxable by the municipality, exceeds the product of 225 percent of the average per capita assessed full and true value of property in the state multiplied by the number of residents of the taxing municipality.
[5] Kenai Peninsula Borough v. State, Dep't of Community and Reg. Affairs, 751 P.2d 14, 16 (Alaska 1988).
[6] See Letter of Commissioner Mallott of the Department of Community and Regional Affairs, 11/2/73. ("[B]roader residential exemptions" would shift the tax burden. "In this manner, the fiscal equity sought by [the proposed act's] requirement that a local property tax `shall be levied at a rate no higher than the millage rate, using the same assessment methods, applicable to other property taxable by the municipality' may be frustrated.").
[7] See AS 29.45.080(a).
[8] Originally the limit was $1000 per person.
[9] A 3% (30 mill) tax cap on the taxation of property by a municipality pre-existed the enactment of the Oil and Gas Property Tax Act. This was not changed by the 1973 act and is contained in AS 29.45.090(a). But section 4 of the 1973 act added a new section (b) to AS 29.45.090, which reiterated the alternative methods set out in AS 29.45.080(b) and (c).
[10] See supra note 6.
[11] See supra note 6.
[12] Free Conference Committee Minutes, November 10, 1973. The alternative cap methods now yield very different results. Using rounded figures for 1997, Valdez's operating revenue under the property cap method was $16 million; under the revenue cap it would have been $6 million; for the North Slope Borough the corresponding figures were $60 million and $19 million.
[13] February 1977 Report (language in parentheses is contained in the Department of Revenue report) (emphasis added).
[14] See City of Dillingham v. CH2M Hill Northwest, Inc., 873 P.2d 1271, 1276 (Alaska 1994).
[15] In re Johnstone, 2 P.3d 1226, 1231 (Alaska 2000) (quoting City of Dillingham v. CH2M Hill Northwest, Inc., 873 P.2d at 1276).
[16] It is important to note that a municipality's total tax base is the same under the formula expressed in subsection .080(c) and under the pro-rata reduction method. Thus local revenue needs can equally well be satisfied under the.080(c) method as under the pro-rata reduction method. The difference is that under pro-rata reduction tax advantaged municipalities are able to shift much of the burden of paying taxes from local property owners to the state.
[17] Other than the revenue cap method expressed in subsection (b) which is not at issue in this case.
[18] Kenai Peninsula Borough v. State, Dep't of Community and Regional Affairs, 751 P.2d 14 (Alaska 1988).
[19] Id.
[20] The Messenger assumptions are no longer realistic. For the tax year 1997the most recent year in which figures are developed in the record before usthe basic data appear to be as follows for the North Slope Borough. I use rounded figures.

 225% cap, $2,200,000,000.
 Oil and gas property, $11,500,000,000.
 Other property, $300,000,000.
Using the Messenger pro-rata reduction method other property is reduced to .1864 of its value before it is taxed. As might be predicted there is little incentive not to impose taxes at near maximum rates, and the 1997 rate was about 28 mills. This amounts to an effective rate on the owners of other property of about 5 mills, shifting about $7,000,000 in payments from these owners to the state.
[21] See AS 43.56.010(b); AS 29.45.050(a).
[22] See supra note 6.
[23] See supra page 28.